IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED IN OPEN COURT
JUL 27 2017
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 1:17-cr-00154 (TSE) |
| v. | COUNT ONE: 18 U.S.C. § 794(c)<br>Conspiracy to Gather or Deliver Defense |
| KEVIN PATRICK MALLORY | Information to Aid a Foreign Government |
| Defendant. | COUNT TWO: 18 U.S.C. § 794(a)<br>Delivering Defense<br>Information to Aid a Foreign Government |
| | COUNT THREE: 18 U.S.C. § 794(a)<br>Attempted Delivery of<br>Defense Information to Aid a Foreign<br>Government |
| | COUNT FOUR: 18 U.S.C. § 1001(a)(2)<br>Material False Statements |
| | FORFEITURE, 18 U.S.C. § 794(d) |

## INDICTMENT

JULY 2017 TERM -- At Alexandria

**THE GRAND JURY CHARGES THAT:**

At all times material to this Indictment, except as otherwise indicated:

### General Allegations

### The Defendant

1. Kevin Patrick MALLORY ("MALLORY") was a 60-year-old self-employed consultant with GlobalEx, LLC. He is a United States citizen who resides and works in Leesburg, Virginia. MALLORY graduated from Brigham Young University in 1981 with a B.A.

degree in Political Science. Between 1981 and 2012 MALLORY worked for various U.S. Government agencies and cleared defense contractors, and spent several periods of time on active duty in the U.S. Army. During much of that time, MALLORY held a TOP SECRET security clearance. MALLORY was fluent in Mandarin Chinese.

2. Unindicted Co-conspirator ("UCC") was a resident of the People's Republic of China ("PRC"). In his interactions with MALLORY, UCC held himself out as working for a PRC think tank, the Shanghai Academy of Social Sciences ("SASS").

**Chinese Institutions, Intelligence Services, and Associated Terms**

3. According to its public website, SASS was "founded in 1958 and administered by the Municipal Government of Shanghai," and "receive[d] most of its funds from the municipal government of Shanghai."

4. The PRC intelligence services ("PRCIS") encompassed both the civilian and military components of Chinese intelligence programs. Civilian intelligence collection was handled by the Ministry of State Security ("MSS"). The MSS was an institution combining functions analogous to the Federal Bureau of Investigation ("FBI") and the Central Intelligence Agency ("CIA") in a single intelligence directorate responsible for counter-intelligence, foreign intelligence, and political security. The MSS consisted of a central ministry, provincial state security departments, and municipal state security bureaus, such as the Beijing State Security Bureau ("BSSB") and the Shanghai State Security Bureau ("SSSB").

5. Among other things, the MSS and its regional bureaus focused on identifying and influencing the foreign policy of other countries, including the United States. The MSS and its bureaus sought to obtain information on political, economic, and security policies that might affect the PRC, foreign intelligence operations directed at the PRC, and biographical profiles of foreign politicians and intelligence officers.

6. Additionally, the MSS and its bureaus were tasked with conducting clandestine and overt human source operations, of which the United States was a principal target. These operations used trained intelligence officers ("IOs"), as well as non-professional collectors known as "cut-outs" or "co-optees." A cut-out or co-optee was a person trusted by both the source and the IO who helped to provide a layer of insulation between an IO and a source, thereby increasing operational security. Cut-outs or co-optees could operate under a variety of covers, posing as diplomats, journalists, academics, or business people both within the PRC and abroad. These individuals were tasked with spotting, assessing, targeting, collecting, and handling sources or assets with access to classified, open-source, proprietary, or sensitive information that the government of the PRC could utilize for economic, political, or military decision-making or advantage.

7. The SSSB had a close relationship with SASS and used SASS employees as spotters and assessors.

8. PRCIS human source operations tended to originate inside the PRC, where the PRCIS preferred to meet with its sources or assets. To facilitate continued meetings inside the PRC, the PRCIS would arrange and/or pay for a source's travel and expenses. The PRCIS was known to pay their sources not only in cash, but also through other means, including business considerations or other types of assistance within the PRC.

### The United States Intelligence Community

9. The U.S. Intelligence Community ("USIC") consisted of U.S. executive branch agencies and organizations that worked separately and together to conduct intelligence activities necessary for the conduct of foreign relations and the protection of the national security of the United States.

10. The U.S. Department of Defense ("DoD") was a U.S. executive branch agency, the mission of which was to provide the military forces needed to deter war and to protect the security of the United States.

11. The Defense Intelligence Agency ("DIA") was a component of DoD and the USIC, which collected (including through classified means), analyzed, produced, and disseminated foreign intelligence and counterintelligence to support national and DoD missions. The DIA planned, managed, and executed intelligence operations during peacetime, crisis, and war. The DIA provided defense-related intelligence for the Secretary of Defense, the Chairman of the Joint Chiefs of Staff, combatant commanders, other DoD components, and non-DoD agencies. Furthermore, the DIA conducted administrative and technical support activities within and outside the United States as necessary for cover and proprietary arrangements. The DIA had facilities in Washington, DC and northern Virginia.

12. The CIA was a U.S. Government intelligence agency with various offices and facilities, and was a component of the USIC. The CIA's primary facility and headquarters were in northern Virginia. The CIA was responsible for, among other things, collecting (including through clandestine means), producing, and disseminating foreign intelligence and counterintelligence used to inform U.S. policy-makers; conducting counterintelligence activities; conducting administrative and technical support activities; conducting covert action activities approved by the President; and conducting foreign liaison relationships with intelligence and security services of foreign governments.

## Classified Information

13. Pursuant to Executive Order 12958 signed on April 17, 1995, as amended by Executive Order 13292 on March 25, 2003, and Executive Order 13526 on December 29, 2009, national security information was classified as "TOP SECRET," "SECRET," or "CONFIDENTIAL." National security information was information owned by, produced by,

produced for, and under the control of the United States government that was classified as follows:

    a.    Information was classified as TOP SECRET if the unauthorized disclosure of that information reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority was able to identify and describe.

    b.    Information was classified as SECRET if the unauthorized disclosure of that information reasonably could be expected to cause serious damage to the national security that the original classification authority was able to identify and describe.

    c.    Information was classified as CONFIDENTIAL if the unauthorized disclosure of that information reasonably could be expected to cause damage to the national security that the original classification authority was able to identify and describe.

14. Access to national security information classified at any level could be further restricted through compartmentation in Sensitive Compartmented Information ("SCI") categories. Only individuals possessing both the appropriate security clearance and specific, additional permissions could have authorized access to SCI.

15. Classified information, including SCI, was marked according to its classification and applicable SCI compartments, following standard formats for different types of media, including headers and footers stating the highest classification level and SCI compartments of information a document contained and individual classifications markings for each paragraph. Information classified at any level could be lawfully accessed only by persons determined by an appropriate United States government official to be eligible for access to classified information, who had signed an approved non-disclosure agreement, received a security clearance, and had a "need to know" the classified information. Classified information could be stored only in an approved facility and container.

16. In addition to classification markings, classified information at times contained dissemination markings which restricted the distribution of the information. These markings included:

a. The "NF" or "NOFORN" dissemination control marking, which stood for "No Foreign Dissemination." The NOFORN marking denoted that dissemination of the information was limited to U.S. persons.

b. The "OC" or "ORCON" dissemination control marking, which stood for "Originator Controlled." The ORCON marking denoted that the information should not be further disseminated to any third party without the concurrence of the agency from which the information originated.

### MALLORY's U.S. Government Security Clearances

17. After his graduation from Brigham Young University in 1981, MALLORY worked full-time in an active-duty military position until 1986.

18. After he left active duty, MALLORY continued his military service as a U.S. Army reservist.

19. From 1987 through 1990, MALLORY worked as a Special Agent for the U.S. Department of State Diplomatic Security Service.

20. From 1990 to 1996, MALLORY worked for the CIA as a covert officer, during which time he served as a CIA case officer.

21. From 1996 to 2007, MALLORY worked at various U.S. Government agencies, for U.S. cleared defense contractors, including as a contractor at the DIA between 2004 and 2005, and on U.S. Army active-duty deployments. MALLORY was stationed in locations including Iraq, the PRC, Taiwan, and the greater Washington, D.C. area.

22. From 2007 to 2010, MALLORY worked as an Intelligence Officer and as a Senior Intelligence Officer with the DIA.

23. From 2010 to 2012, MALLORY worked as a CIA contractor.

24. Since 2012, MALLORY has been self-employed, running a consulting business called GlobalEx, which MALLORY incorporated in 2007. GlobalEx's business address is MALLORY's home address in Leesburg, Virginia.

25. As required for his various government positions, MALLORY obtained a TOP SECRET//SCI security clearance, which was active during various assignments during his career. MALLORY's security clearance was terminated in October 2012 when he left government service.

26. Because MALLORY held a security clearance and was assigned to various U.S. Government agencies, both as an employee and as a private contractor, the U.S. Government entrusted MALLORY with access to sensitive government materials, including information relating to the national defense that was closely held by the government ("National Defense Information") and classified documents and materials.

27. Throughout his career, as a prerequisite to his access to classified information, MALLORY signed numerous non-disclosure forms in which he acknowledged both the harm that could result from the unauthorized disclosure of classified information and the applicability of criminal espionage laws should MALLORY make unauthorized disclosures of such information.

## COUNT 1

### CONSPIRACY TO GATHER OR DELIVER DEFENSE INFORMATION TO AID A FOREIGN GOVERNMENT

THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1-27 of this Indictment are incorporated by reference and re-alleged as though set forth fully herein.

2. Between on or about February 22, 2017 and June 22, 2017, in Loudoun County in the Eastern District of Virginia and elsewhere, including locations outside of the jurisdiction of any particular state or district, defendant KEVIN PATRICK MALLORY, did knowingly and unlawfully conspire with UCC and others, known and unknown to the grand jury, to communicate, deliver, and transmit to a foreign government, to wit: the Government of the People's Republic of China, and representatives, officers, agents, employees, subjects and citizens thereof, directly and indirectly, classified documents and information relating to the national defense of the United States, with intent and reason to believe that such documents and information were to be used to the injury of the United States and to the advantage of a foreign nation, namely, the Government of the People's Republic of China.

### MANNER AND MEANS OF THE CONSPIRACY

A. It was a part of the conspiracy that MALLORY would transfer, and attempt to transfer, to UCC documents and information relating to the national defense of the United States, specifically, documents and information classified at the SECRET and TOP SECRET levels in exchange for money from UCC.

B. It was further a part of the conspiracy that MALLORY and UCC communicated using devices that they believed to be secure in order for MALLORY to sell to UCC information relating to the national defense of the United States.

C. It was further a part of the conspiracy that UCC paid for MALLORY to take two trips to China in 2017 in order to meet personally with UCC.

D. It was further a part of the conspiracy that UCC paid MALLORY for, among other things, his travel to the PRC and time spent meeting with UCC while there.

E. It was further a part of the conspiracy that MALLORY transmitted and attempted to transmit to UCC documents and information relating to the national defense of the United States, specifically, documents and information classified at the SECRET and TOP SECRET levels, using the device provided by UCC.

F. It was further a part of the conspiracy that MALLORY used the device provided by UCC to communicate with UCC about the classified documents that MALLORY had improperly retained.

## OVERT ACTS

In furtherance of the said conspiracy and to effect the objects thereof, MALLORY and other conspirators committed the following overt acts in the Eastern District of Virginia and elsewhere, including, but not limited to, the following:

1. In or around February 2017, MALLORY was contacted on a social media site by a Chinese recruiter (hereinafter "PRC1"). Over the next several days, MALLORY had phone interviews with PRC1 and was introduced by PRC1 to UCC, represented by PRC1 to be a potential client for MALLORY.

2. MALLORY travelled to Shanghai, PRC in or around March 2017 and April 2017, where he met with UCC and UCC's boss (hereinafter "PRC2").

3. MALLORY received cash payments of $10,000 U.S. Dollars ("USD") and $15,000 USD in March and April 2017, respectively, from UCC while in the PRC.

9

4. MALLORY communicated in or around February or March 2017 with one or more former CIA co-workers (to include two individuals, hereinafter "Employee1" and "Employee2") and requested their help contacting a specific department at the CIA.

5. In or about April 2017, UCC provided MALLORY with a Samsung Galaxy Note 4 ("Samsung phone"), to be used for secure communications, which MALLORY called a "covcom" device. UCC trained MALLORY in how to use the device.

6. On or about April 21, 2017, after a return flight to the United States from Shanghai, China, where he had met with UCC, U.S. Customs and Border Protection ("CBP") conducted a secondary search and interview of MALLORY at Chicago O'Hare International Airport. During the CBP interview, MALLORY stated that he was outside the United States for one week and that he was returning from Shanghai. MALLORY also stated that it was a business trip as well as a father/son vacation. MALLORY stated that he was currently a consultant for "GlobalEx," which MALLORY stated was a company he founded in 2010. MALLORY said that, while in the PRC on this trip, he met with an individual whom he knew through MALLORY's church, and stated that he was consulting with this individual on anti-bullying/family safety development. MALLORY also stated that he did not receive anything from this individual during his trip.

7. On the same return trip, MALLORY checked "no" in response to question no. 13 on the CBP Customs Declaration Form 6059b, which asked whether he was carrying over $10,000 in U.S. or foreign currency. CBP, however, found $16,500 USD in MALLORY's two carry-on bags.

8. On or about April 25, 2017, MALLORY transferred eight U.S. Government documents belonging to CIA and the DIA, and classified at the SECRET and TOP SECRET levels, to a Toshiba SD card. Some of these documents were further compartmented as SCI and

had NOFORN and ORCON dissemination controls. Each of the eight documents had a handwritten cover sheet which included the item number of the document, a brief title for the document, and the number of pages for each document.

9. At some point on or after April 25, 2017, but no later than June 22, 2017, MALLORY concealed the Toshiba SD card in aluminum foil and placed the concealed Toshiba SD card in a tray on a shelf within the master bedroom closet in his residence.

10. At some point prior to June 22, 2017, MALLORY deleted the same eight classified CIA and DIA documents from a second SD card.

11. In or about April 2017, MALLORY again contacted Employee1, requesting help arranging a meeting with the CIA to discuss people MALLORY had recently met with in the PRC. This contact occurred after MALLORY was subjected to the above-described secondary search and interview by CBP, during which CBP discovered the $16,500 USD in undeclared currency.

12. At some point on or after April 25, 2017, but no later than May 3, 2017, MALLORY transmitted to UCC, via the Samsung phone provided to him by UCC, two DIA documents classified as SECRET//NOFORN and SECRET//NOFORN/ORCON. During subsequent communications regarding the documents, MALLORY and UCC referred to them as "No1" and "No2."

13. In a recovered secure message sent from the Samsung phone on or about May 1, 2017, MALLORY wrote to UCC, "Also, we may need to go again step by step in my getting the document to become part of the image. Then sending it to you."

14. In messages sent on or about May 3, 2017, UCC and MALLORY discussed documents, "no1 and no2," which MALLORY had provided to UCC.

15. As part of their May 3, 2017 discussions via the Samsung phone, UCC complained to MALLORY that one of the documents, "no1," had not been sent in full. UCC

also asked MALLORY to "pls send the no2 . . . and the FISN. . . otherwise I will be in a extremely awkward situation[.]"

16. During the May 3, 2017 communication, UCC wrote, "I suggest you send all and retype the handwriting. And NO1 is obvious the first page of a complete article, where's the else is and why it is black on top.and bottom....We will try our best to apply for another sum of amount, as you required. However, i'm not sure it will be the same amount for now and I will try, and for safety, we cannot send u in one time or in a short period altogether, need to figure out a better way[.]"

17. In messages to UCC that MALLORY sent on or about May 3, 2017, MALLORY responded, "The black was to cross out the security classification (TOP SECRET//ORCON//...I had to get it out without the chance of discovery. Unless read in detail, it appeared like a simple note...I have arranged for a USD account in a another name."

18. In the same communication, MALLORY wrote to UCC, "You can send the funds broken into 4 equal payments over 4 consecutive days...When you agree I will send you the bank I.g. instructions."

19. Also during the May 3, 2017 communication, MALLORY stated, "It was dicey (look it up) when they asked for me by name. If they we looking for me in terms of State Secrets, and found the sd card..., we would not be talking today. I am taking the real risk as you, [PRC2], and higher up bosses know... When you get the OK to replace the prior payment, the I will send more docs. I will also type my notes. NOTE: in the future, I will destroy all electronic records after you confirm receipt...I already destroyed the paper records. I cannot keep these around...too dangerous."

20. On May 5, 2017, MALLORY sent additional messages to UCC via the Samsung phone provided by UCC, stating, "Sending. . . [Document No. 2] and FISA. CONFIRM RECEIPT. . . . I will type two pages of notes (no. 1) and send later today or tomorrow."

21. During the same May 5, 2017 exchange, MALLORY wrote, "I am expecting the previous payment ( $15k +$4,400) seized at border. And at least $????, for the materials I have provided. At this point all the risk is on me. . . I will provide you banking instructions for you to send the monies. The money will go to the bank account is not in my true name but I have access to." MALLORY later stated, "I have a account not in the US You can send it to And I have the means to move it from there[.]"

22. Subsequently, during the May 5, 2017 messages, MALLORY wrote, "Send 1 . . .Send 2. . .FYI . . . The two pages of hand notes are unrelated to the one page above it."

23. UCC responded to the May 5, 2017 messages from MALLORY, stating, "Pls resent the previous messages, couldn't seen then." Later that same day MALLORY responded, "This system sucks it's too cumbersome." MALLORY added later in the conversation, "I put all these messages and then you can't read them because you're not logged in the same time, that's a poor system[.]" UCC responded "Thats For safety[.]" MALLORY responded "I sent two pictures documents can you see them? . . . I did not know I could not leave a secure message for you[.]"

24. In messages sent on or about May 5, 2017, MALLORY wrote, "your object is to gain information, and my object is to be paid for." UCC responded, "My current object is to make sure your security and try to reimburse you."

25. On or about May 24, 2017, MALLORY met with agents of the FBI and falsely told the agents multiple times that he did not provide PRC IOs with any documents in any format, whether in paper or electronic form, beyond two short, unclassified white papers he claimed to have written using information in his head as well as information from open sources.

13

26. On or about May 24, 2017, MALLORY provided his Samsung phone to agents of the FBI. A later examination of the Samsung phone revealed that it contained encrypted documents consisting of three CIA documents classified at the SECRET and TOP SECRET levels and a DIA document classified at the SECRET//NOFORN/ORCON level. Also stored on the device was a handwritten table of contents. The titles and numbering of the eight documents listed in the handwritten table of contents corresponded with the titles and numbering of the eight cover sheets for the documents that MALLORY had saved on the Toshiba SD card.

(All in violation of Title 18, United States Code, Section 794(c)).

## COUNT 2

## DELIVERING DEFENSE INFORMATION TO AID A FOREIGN GOVERNMENT

THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1-27 of the General Allegations section and paragraphs 1-26 of the Overt Acts section of Count 1 of this Indictment are incorporated by reference and re-alleged as though set forth fully herein.

2. Between on or about February 22, 2017 and June 22, 2017, in Loudoun County in the Eastern District of Virginia and elsewhere, including locations outside of the jurisdiction of any particular state or district, defendant KEVIN PATRICK MALLORY, did knowingly and unlawfully communicate, deliver, and transmit to a foreign government, to wit: the Government of the People's Republic of China, and representatives, officers, agents, employees, subjects and citizens thereof, directly and indirectly, classified documents and information relating to the national defense of the United States, with intent and reason to believe that such documents and information were to be used to the injury of the United States and to the advantage of a foreign nation, namely, the Government of the People's Republic of China.

(All in violation of Title 18, United States Code, Section 794(a)).

## COUNT 3

## ATTEMPTED DELIVERY OF DEFENSE INFORMATION
## TO AID A FOREIGN GOVERNMENT

THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1-27 of the General Allegations section and paragraphs 1-26 of the Overt Acts section of Count 1 of this Indictment are incorporated by reference and re-alleged as though set forth fully herein.

2. Between on or about February 22, 2017 and June 22, 2017, in Loudoun County in the Eastern District of Virginia and elsewhere, including locations outside of the jurisdiction of any particular state or district, defendant KEVIN PATRICK MALLORY, did knowingly and unlawfully attempt to communicate, deliver, and transmit to a foreign government, to wit: the Government of the People's Republic of China, and representatives, officers, agents, employees, subjects and citizens thereof, directly and indirectly, classified documents and information relating to the national defense of the United States, with intent and reason to believe that such documents and information were to be used to the injury of the United States and to the advantage of a foreign nation, namely, the Government of the People's Republic of China.

(All in violation of Title 18, United States Code, Section 794(a)).

## COUNT 4

## MATERIAL FALSE STATEMENTS

THE GRAND JURY FURTHER CHARGES THAT:

On or about May 24, 2017, in Loudoun County, in the Eastern District of Virginia, defendant KEVIN PATRICK MALLORY did knowingly and willfully make materially false, fictitious, and fraudulent statements or representations to the government, in a matter within the jurisdiction of the executive branch of the Government of the United States. Specifically, KEVIN PATRICK MALLORY knew that the FBI was investigating his contacts with individuals working for the government of the People's Republic of China, and he also knew that the FBI was attempting to determine if MALLORY had provided any classified documents to individuals working for the People's Republic of China. Nonetheless, in response to the FBI's questions, MALLORY (a) falsely stated to FBI agents that he had not provided additional documents, beyond two unclassified white papers, to individuals he identified as PRC IOs, when, in truth and in fact, as he then well knew, he had previously provided at least two classified documents to individuals he knew to be PRC IOs; and (b) falsely stated to FBI agents that he had never transmitted documents, other than a test message, using a covert communication device provided to him by the person he knew to be a PRC IO, when in truth and in fact, as he then well knew, he had previously used that device to transmit at least two classified documents to the PRC IO.

(All in violation of Title 18, United States Code, Section 1001(a)(1))

## FORFEITURE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT THE PROPERTY DESCRIBED BELOW IS SUBJECT TO FORFEITURE:

1. The defendant, KEVIN PATRICK MALLORY, is notified pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, that if he is convicted of any of the offenses set forth in Counts One through Three of this indictment, he shall forfeit to the United States pursuant to Title 18, United States Code, Section 794(d), the following property:

   a. Any property constituting, or derived from, any proceeds the defendant obtained, directly or indirectly as the result of such violation; and

   b. Any property used, or intended to be used, in any manner or part, to commit or to facilitate the commission of such violation.

2. Pursuant to Title 21, United States Code, Section 853(p), the defendant shall forfeit substitute property, up to the value of the property subject to forfeiture if: (i) the property subject to forfeiture cannot be located upon the exercise of due diligence; (ii) has been transferred, sold to, or deposited with a third party; (iii) has been placed beyond the jurisdiction of the Court; (iv) has been substantially diminished in value; or (v) has been commingled with other property which cannot be divided without difficulty.

3. The property subject to forfeiture includes at least $25,000.00 in United States currency, a Samsung Galaxy Note 4 telephone, and an iPhone 7 telephone, representing proceeds the defendant obtained in the course of the conspiracy and property used to facilitate the commission of the violations of Title 18, United States Code, Section 794, as alleged in Counts One through Three of this Indictment.

(In accordance with Title 18, United States Code, Section 794(d)).

A TRUE BILL:

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

FOREPERSON OF THE GRAND JURY

Dana J. Boente
United States Attorney

By:

John T. Gibbs
Assistant United States Attorney

By:

Colleen E. García
Assistant United States Attorney

Jennifer Kennedy Gellie
Trial Attorney
National Security Division
United States Department of Justice